UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MARITIME EXCHANGE MUSEUM, et al,

    Defendants.
_____/

Case No. 16-cv-13198

HON. MARK A. GOLDSMITH

**OPINION & ORDER**
**(1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. 26) AND**
**(2) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 25)**

This matter is before the Court on the parties' competing motions for summary judgment. The issues were fully briefed, and a hearing was held on November 8, 2017. For the reasons stated below, the Court grants the Government's motion for summary judgment (Dkt. 26) and denies Defendants Maritime Exchange Museum and Steven Gronow's motion for summary judgment (Dkt. 25).[1]

**I. BACKGROUND**

Defendant Steven Gronow runs the Maritime Exchange Museum out of his home. Pl. Mot. for Sum. Judg. ¶ 4. The museum displays a collection of lighthouse lenses. Id. Two particular lenses previously used by the United States are at issue: one Fresnel lens marked H.L. 331, which was formerly used at the light house at Spring Point Ledge, Maine (the "Spring Point Ledge lens") and another Fresnel lens marked B.F. 53, which was formerly used in the Belle Isle Light Station

---

[1] The Maritime Exchange Museum is not a legal entity; rather, it is an informal name for Gronow's collection. Pl. Mot. for Sum. Judg. ¶ 4. This Opinion will, therefore, simply refer to Gronow, unless the context otherwise requires.

1

in Detroit, Michigan (the "Belle Isle lens"). Id. ¶¶ 1-2. Both lenses had fallen out of the possession of the United States and were purchased by Gronow. Id. ¶¶ 14-15, 21. The Government brought this suit seeking a declaratory judgment that the United States is the owner of both lenses, and also seeking a judgment for possession for the lenses. See Compl. ¶¶ 1-2 (Dkt. 1).

The material facts of the case are, for the most part, undisputed. Around 1960, the Spring Point Ledge Light Station transitioned to an automatic and unattended operation, necessitating the replacement of the Spring Point Ledge lens. Spring Point Ledge Light Station Change A, Ex. F to Pl. Mot. for Sum. Judg., at 266-267 (Dkt. 26-7). According to a government work order, the lens was to be returned to a Coast Guard base in Portland, Maine; if it was deemed beyond repair, that work order mandated that the lens be discarded overboard in deep waters. Id. at 267. There is no written record of the location of the Spring Point Ledge lens after 1960, Def. Mot. for Sum. Judg. ¶ 5, until, in 1998, the United States deeded the Spring Point Ledge Light Station to the Spring Point Ledge Light Trust, while maintaining all right, title, and interest in the lenses associated with the property. Quit Claim Deed, Ex. E to Pl. Mot. for Sum. Judg., at 153 (Dkt. 26-6). In 2003, the Spring Point Ledge lens was put up for auction on eBay by a person named Pat Jones. eBay Listing, Ex. G to Pl. Mot. for Sum. Judg. (Dkt. 26-8). In lieu of bidding on the auction, Gronow contacted the seller and made an offer for the lens, ultimately buying the lens for around $46,000. Gronow Dep., Ex. C to Pl. Mot. for Sum. Judg., at 41 (Dkt. 26-4).

The other lens at issue was formerly used in the Belle Isle Light Station. In or around 1930, the Coast Guard decommissioned the lighthouse, and the lens was removed and decommissioned later that decade. Def. Mot. for Sum. Judg. ¶ 8. The Government's last known custody and control of the lens was in 1937. Id. ¶ 9. In January 1946, the Coast Guard announced that it would make antiquated navigational aids available to museums, schools, and maritime societies "in a loan

status." USCG memo, Ex. L to Pl. Mot. for Sum. Judg. (Dkt 26-13). The memo made clear that the aids could be loaned indefinitely, but that the Coast Guard, due to legal restrictions, could not dispose of them as gifts. Id. In October 1946, the Henry County Historical Society Museum in Henry County, Indiana announced that it was "obtaining the loan of a light house lens, the loan probably culminating into permanent ownership by the museum." Henry County Historical Society Meeting Notes, Ex. K to Pl. Mot. for Sum. Judg. (Dkt. 26-12).[2] Decades later, in 2005, Gronow learned that the lens was located in the basement of the Henry County Historical Society in Henry County, Indiana. Gronow Dep. at 53. Gronow purchased the lens from the Historical Society for $25,000 in February 2006. Wire Transfer, Ex. J to Pl. Mot. for Sum. Judg. (Dkt. 26-11).

The Government brought this suit seeking a declaratory judgment that the United States is the owner of the two lenses, and seeking an order directing the return of the two lenses to the Coast Guard's possession and control. The parties do not dispute that the United States once owned both lenses and that it is no longer in possession of them. The disagreement between the parties at this juncture centers on how current ownership is proven and who must prove it. Both parties bring summary judgment motions arguing accordingly.

## II. STANDARD OF REVIEW

---

[2] Gronow objects to the admission of the meeting notes on the basis of hearsay. However, under Federal Rule of Evidence 803(16), a statement is not hearsay if it appears "in a document that was prepared before January 1, 1998, and [if its] authenticity is established." This document was prepared in 1946 and the Court has no reason to doubt its authenticity, so the Court determines that the statement is not hearsay. See United States v. Kalymon, 541 F.3d 624, 633 (6th Cir. 2008) ("A document can be authenticated under Rule 901(b)(8) by showing, among other things, that the document's condition creates no suspicion concerning its authenticity.") (internal quotation marks omitted).

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

### III. ANALYSIS

Both sides agree that the lenses were originally property of the United States. Where they disagree is whether the record of subsequent events, presented at this summary judgment stage, establishes that the United States has lost its ownership interest. The Government contends that

only properly authorized acts by Government employees are sufficient to terminate its ownership, and that the record shows no such events. Gronow's response is two-fold: (i) because the Government no longer possesses the property, it bears the burden of establishing that no acts extinguishing its interest took place, and it has not met this burden; and (ii) as a good faith purchaser, Gronow has rights superior to the Government, regardless of whether such acts took place. The Government replies that (i) it has no burden to establish that there were no ownership extinguishing acts, but if so, it has met that burden; and (ii) the good faith purchaser doctrine has no application here. The Court agrees with the Government.

The Government's property rights are grounded in the Constitution itself, which assigns to Congress the power to establish rules governing the property of the United States. See U.S. Const. Art. IV, § 3, Cl. 2 ("The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States . . . ."). From this bedrock grant of authority, the Supreme Court has concluded that individual Government officials have no power to dispose of property, except as Congress has authorized. As explained in Royal Indemnity Co. v. United States, 313 U.S. 289 (1941), where the Court invalidated a purported abatement of tax by a collector who lacked the statutorily required approval of the IRS Commissioner or Treasury Secretary:

> Power to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution. Art. IV, s 3, Cl. 2. Subordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted.

Id. at 294.

These principles are further illustrated in United States v. California, 332 U.S. 19 (1947), where the federal government brought suit to establish its paramount ownership interest in a three-

mile wide coastal strip, in derogation of coastal leases that the State of California had executed with private parties permitting extraction of gas and mineral deposits. In recognizing the federal government's paramount claim, the Court rejected California's attempt to defeat the claim by asserting arguments akin to laches, estoppel, and adverse possession, which were based on unauthorized conduct of lower federal government officials, including statements recognizing California's land claims. None of the unauthorized conduct could undermine Congress's power to protect federal property:

> The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act.

Id. at 40.

Not only must the purported act of extinguishment be authorized by Congress, it must be an explicit action. This is illustrated by United States v. Steinmetz, 973 F.2d 212 (3d Cir. 1992), in which the court determined that the bell from a Confederate Navy boat sunk by the Union Navy off the coast of France in 1864 remained property of the United States, although it was submerged and unclaimed until retrieved by divers in 1979 and sold to an antique dealer in London. After concluding that the Confederate ship had become United States property through the succession doctrine, the court held that the United States retained ownership, as it had taken no explicit action to divest itself of that ownership. Id. at 222 ("[T]he United States cannot abandon its own property except by explicit acts.").

Because it is undisputed that the lenses originally were owned by the United States, the question becomes: what authorized and explicit acts, if any, served to divest the Government of its

ownership interest? A review of the summary judgment record for each lens demonstrates no such acts.

The history trail of the Spring Pointe Ledge lens reveals only evidence that the Government never gave up its ownership interest. In 1998, the Government deeded the light station where the lens had been located to the Spring Point Ledge Light Trust. But the conveyance expressly reserved all "right, title and interest in the lenses associated with the property." Quit-Claim Deed at 153. Years before, in 1960, a work order for repair of the lens provided that the lens be discarded in deep waters if it was found not to be repairable. But that almost certainly did not happen, as it showed up on an eBay auction in 2003. Thus the only record evidence is that the United States never authorized abandonment, conveyance, or any other extinguishment of its ownership interest in the lens.

The absence of any record, viewed in light of then applicable law, confirms that no authorized action was taken to extinguish the Government's ownership interest in the lens. When the Spring Point Ledge lens was taken out of commission in 1960, the Federal Property and Administrative Services Act of 1949, see Pub. L. No. 152, Ch. 288, 63 Stat. 377, Ex. Q to Pl. Mot. for Sum. Judg. (Dkt. 26-18), enacted after World War II to address the accumulation of property no longer needed for the massive war effort, was in effect. The act gave the Surplus Property Administration power to authorize the abandonment, destruction, or donation to public bodies of property deemed surplus. See 63 Stat. 385, § 202(h). Regulations were put in place by the Administration requiring written findings justifying abandonment, destruction, or donation to public bodies of property. See 14. Fed. Reg. at 5515, § 3, Ex. R to Pl. Mot. for Sum. Judg. (Dkt. 26-19). Neither party has pointed to any evidence of any written findings regarding abandonment or donation of the lens. This corroborates the Government's view that no authorized action was

undertaken to extinguish the Government's interest in the lens. And it undermines Gronow's argument that the lens was – somehow, somewhere and sometime – abandoned.

The history of the Belle Isle lens is of a similar nature. The record evidence demonstrates unequivocally that the Henry County Historical Society received the lens in 1946 as a loan from the Coast Guard. This is consistent with the Coast Guard's general announcement that year that it had established a program for making available to schools, museums, and maritime societies decommissioned navigational aids, including lenses, to museums and schools "in a loan status." See USCG memo. This dovetails with the minutes of the Historical Society, which records an announcement by the society's curator of "an offer received in regard to obtaining the loan of a lighthouse lens . . . ." See Henry County Historical Society Meeting Notes. While the same minutes reflect a hope of "the loan probably culminating into permanent ownership by the museum," id., there is no evidence that that hope was ever realized. In fact, "ownership" was expressly negated in the Coast Guard's announcement of the program. See USCG memo ("Because of legal restrictions the Coast Guard cannot dispose of the lenses as a gift, but can loan them indefinitely to responsible institutions."). Undoubtedly, it was the permanent placement of the lens that the curator must have had in mind when he made his prediction that the loan would probably culminate in permanent ownership. In any case, the curator's prediction of ownership has no relevance on whether any government official was authorized to extinguish the Government's ownership interest or performed any such act of extinguishment. See United States v. Steinmetz, 763 F. Supp. 1293, 1298 (D.N.J. 1991), aff'd, 973 F.2d 212 (3d Cir. 1992) ("[O]nly Congress and those persons authorized by Congress may dispose of United States property pursuant to appropriate regulations.").

Gronow speculates that the Coast Guard donated the lens, see Def. Mot. at 12-14, but there is no evidence to support this. The absence of any writing is telling, because applicable law required written recordation of any such donation. When the Belle Isle Lens was loaned to the Henry County Museum in 1946, the Surplus Property Act of 1944, Pub. Law No. 152, Ch. 288, 58 Stat. 765, Ex. N to Pl. Mot. for Sum. Judg. (Dkt. 26-15), the predecessor to the Federal Property and Administrative Services Act, was in effect. The Act required that any property that a federal agency deemed surplus be reported to the Surplus Property Administration, see 58 Stat. Chap. 769, § 11(a). It allowed for donation of surplus property if the property had no commercial value, or if the cost of care, handling, and disposition exceeded the estimated sales proceeds. See 58 Stat. Chap. 771 § 13(b). The Act also allowed the Surplus Property Board to prescribe regulations related to donation of property. Id. An associated federal regulation required that such a finding allowing donation of property be reduced to writing. 10 Fed. Reg. at 14967, § 8319.3, Ex. P to Pl. Mot. for Sum. Judg. (Dkt. 26-17). The absence of any writing under the Surplus Property Act for donation of the lens is consistent with the conclusion that there was no donation, which in turn is consistent with the Coast Guard memo announcing the transfer of lenses on strictly a loan basis.

Gronow argues that the Government has improperly shifted the burden of proof onto him to show that there were authorized acts extinguishing the Government's interest. See Def. Resp. to Pl. Mot. for Sum. Judg. at 10 (Dkt. 31). But whether demonstrating the absence of such acts is properly part of the Government's case-in-chief or whether showing the existence of such acts is a necessary part of Gronow's defense is entirely irrelevant. Here, both parties have engaged in extensive discovery, filed cross-motions for summary judgment, and presented the results of their historical research as part of the summary judgment record. The Court can review the record to

determine whether any evidence exists showing some triable issue of fact on extinguishment of the Government's interest. There is none.

Gronow misconceives the Government's burden on summary judgment in support of its motion. Even assuming that the absence of authorized extinguishing acts is part of its case in chief, the Government, as moving party in support of its claims, need only show that there is enough evidence to satisfy every element of its claims. See Vance v. Lattimer, 648 F. Supp. 2d 914, 919 (E.D. Mich. 2009) (describing that when "the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense."). The long history that has been presented shows no evidence of authorized ownership extinguishing acts despite a reasonably diligent effort by both sides.

To the contrary: the Coast Guard's chief curator submitted a declaration substantiating the absence of any records showing gifting or abandonment of the lenses at issue here. See Danielson Decl., Ex. A to Pl. Reply (Dkt. 33-2). Her job as curator includes overall management of the entire Coast Guard Curatorial Services Program. Her responsibilities include "monitoring, tracking, organization and preservation of over 20,000 heritage assets of the Coast Guard's artifact collection located . . . throughout the United States." Id. ¶ 2. She is also responsible for superintending the active loan program of historic artifacts and Fresnel lenses. Id. Her office is in possession of files regarding such lenses, including accession, loan, archival and reference files from the early twentieth century to the present day. Id. ¶ 4. She attests that she is familiar with the files and also the Coast Guard's data base, which inventories personal property held by the Coast Guard. Id. ¶¶ 4-5. She is also familiar with documents memorializing sales and donations. Id. ¶ 5. She concludes that, after performing a diligent search of her office and property office,

she has found no evidence of officially sanctioned gifting or abandoning of Fresnel lenses and no documentation of such transactions. Id. ¶ 9. She notes that the Coast Guard had a long practice of lending historic Fresnel lenses, id. ¶ 6, but she does not know of "any official Coast Guard practice of selling, donating, or abandoning or scrapping Fresnel lenses," id. ¶ 7.

This evidence is surely sufficient to meet the Government's burden of supplying evidence to satisfy all elements of its claim, even assuming it has the burden of showing no authorized and explicit acts of extinguishment. Under standard summary judgment practice, Gronow has the burden to come forward with evidence showing a genuinely disputed issue of fact that there were such acts. See Dow Corning Corp. v. Weather Shield Mfg., Inc., 790 F. Supp. 2d 604, 609 (E.D. Mich. 2011) (describing that on plaintiff's motion for summary judgment, once the initial burden is discharged, "[t]he burden then shifts to the opposing party who must set out specific facts showing a genuine issue for trial.") (internal citations omitted). Gronow has not done that here.[3]

Gronow is left arguing that he is a good faith purchaser under a state statute. Mich. Comp. Laws § 440.2403. But that provides him no support. State law cannot override federal law on the Government's rights in its property. See California, 332 U.S. at 29 (dismissing California's argument that its state constitution entitles it to ownership of land within three miles of the coast).

---

[3] Gronow points to the deposition testimony of Chad Kaiser, an individual who actually purchased the Spring Point Ledge lens on behalf of Gronow. Kaiser says that his seller, Pat Jones, related to him that her husband had acquired the lens. Kaiser Dep., Ex. H to Pl. Mot. for Sum. Judg., at 53 (Dkt. 26-9). The acquisition is not spelled out in the testimony, but apparently Jones's husband had been in "the northeast somewhere" and had witnessed the Coast Guard destroying lenses; the husband asked "his contact at the Coast Guard that if they were gonna destroy another lens to please let him know." Id. This testimony does not clarify how the lens was acquired, but there is certainly nothing in the testimony to suggest it was done in an authorized and explicit manner. Rather, it appears consistent with Danielson's declaration that there were occasions when lenses found their way into the possession of private individuals in unauthorized ways. Danielson Decl., ¶ 9. Kaiser's hearsay testimony about what Ms. Jones learned from her husband does not show any authorized act extinguishing the Government's rights in the lens.

Additionally, Gronow points to no federal statute incorporating the Michigan statute.[4] Thus he has no basis to invoke the good faith purchaser doctrine, even assuming he would qualify as a good faith purchaser.[5]

Gronow seeks comfort in United States v. Ary, 224 F. Supp. 3d 1186 (D. Kan. 2016), a case far different from ours. There, the Government sought to set aside a forfeiture sale, when it learned that the property it had sold was a bag of moon dust from the Apollo 11 lunar mission, to which NASA claimed title. Under the federal forfeiture statutes, the bag became property of the United States, which title passed to the purchaser, whom the court deemed a good faith purchaser, leading the court to deny the motion to set aside the sale. Our case does not present analogous circumstances. Gronow's seller was not the United States, but some private party. And no one further up the chain of ownership ever received good title from the United States, so as to pass it further down the chain and ultimately to Gronow. The good faith purchaser principles recognized in Ary have no application here.[6]

---

[4] Gronow is not invoking the Federal Property and Administrative Services Act, 40 U.S.C. § 101, et seq., which allows a bona fide purchaser to present his bill of sale, executed by an executive agency, as conclusive evidence of compliance with that statute's requirements for purchases from the Government. 40 U.S.C. § 544. Gronow has no bill of sale from the Government.

[5] A person can only qualify as a bona fide purchaser if that individual has no notice of another's rightful claim to the property. See Shaw v. Merchants' Nat. Bank, 101 U.S. 557, 566 (1879) ("[T]he purchaser of such a bill, with reason to believe that his vendor was not the owner of the bill, or that it was held to secure the payment of an outstanding draft, is not a bona fide purchaser, and he is not entitled to hold the merchandise covered by the bill against its true owner."). Here, Gronow had, at a minimum, constructive notice that the lenses were Government property, as the lenses were part of a lens database to which Kaiser – who performed lens research for Gronow and made purchases on his behalf – had access, see Kaiser Dep., Ex. H to Pl. Mot. for Sum. Judg., at 70 (Dkt. 26-9). The database would have alerted Gronow, through his agent Kaiser, that the Government potentially maintained an interest in the lenses. See Lens Database Excerpts, Exs. A and B to Pl. Mot. for Sum. Judg. (Dkts. 26-2, 26-3).

[6] Consistent with this, the Michigan statute Gronow invokes, Mich. Comp. Laws § 440.2403, does no more than recognize that a person with "voidable title" has power to transfer good title to a

## IV. CONCLUSION

For the above-stated reasons, the Court grants the Government's motion for summary judgment (Dkt. 26) and denies Defendants Maritime Exchange Museum and Steven Gronow's motion for summary judgment (Dkt. 25). Within 14 days, the parties shall present a proposed judgment consistent with this Opinion and Order.

SO ORDERED.

Dated: March 26, 2018                 s/Mark A. Goldsmith
       Detroit, Michigan              MARK A. GOLDSMITH
                                       United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 26, 2018.

                                                       s/Karri Sandusky
                                                       Case Manager

---

bona fide purchaser. Because there is no evidence that anyone acquired the Government's property in an authorized manner, no one ever had any title to convey to Gronow, and no one in the chain of transactions ever acquired title to what amounts to stolen property. See In re Newpower, 233 F.3d 922, 929 (6th Cir. 2000) ("[I]t remains good law in the state of Michigan . . . long established at common law, that a thief has no title in the property that he steals.")